[ORAL ARGUMENT NOT YET SCHEDULED]
No. 23-7141 and No. 23-7145

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

SAMUEL SHANKS,

*Appellant*

*v.*

INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS,

*Appellee*

On Appeal from the U.S. District Court for the District of Columbia
Civil Action No. 1:23-cv-00311-CKK

TAYLOR LAMBERT,

*Appellant*

*v.*

INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS,

*Appellee*

On Appeal from the U.S. District Court for the District of Columbia
Civil Action No. 1:23-cv-00309-CKK

Reply Brief of Appointed *Amicus Curiae* in Support of Appellants

Alexandra Mansbach
Ruthanne M. Deutsch
Hyland Hunt
DEUTSCH HUNT PLLC
300 New Jersey Ave. NW
Suite 300
Washington, DC 20001
(202) 868-6915
Lmansbach@deutschhunt.com

*Appointed Amicus Curiae in Support of Appellants*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................... ii

GLOSSARY ................................................................................................. v

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................1

ARGUMENT ...............................................................................................4

I.    APPELLANTS HAVE SUFFICIENTLY PLED THAT BAC'S COVID-19 VACCINE POLICY HAD A DISPARATE IMPACT ...................................4

    A.    Appellants Have Sufficiently Pled A Statistical Disparity ...................5

    B.    Appellants Have Alleged Causation Under Any Standard .................12

        *1.*    *BAC invents a brand-new requirement for disparate impact: a "race-related barrier." * ..............................................13

        *2.*    *Even if BAC's newfound "race-related barrier" requirement had a basis in the law, Appellants have pled two such barriers here. * ...........................................15

        *3.*    *BAC creates a new and unworkable requirement that disparate impact cannot involve an "easy choice." * .................18

II.    APPELLANTS HAVE SUFFICIENTLY ALLEGED A PLAUSIBLE CLAIM OF DISPARATE TREATMENT ...............................................................22

CONCLUSION ...........................................................................................31

# TABLE OF AUTHORITIES

## Cases

*2922 Sherman Ave. Tenants' Ass'n v. District of Columbia*,
    444 F.3d 673 (D.C. Cir. 2006)..............................................................23

*Adams v. City of Indianapolis*, 742 F.3d 720 (7th Cir. 2014)....................................5

*Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284 (D.C. Cir. 1998)............................28

*Allen v. Johnson*, 795 F.3d 34 (D.C. Cir. 2015) .....................................................26

*Barnes v. Gencorp, Inc.*, 896 F.2d 1457 (6th Cir. 1990) ..........................................7

*Betsey v. Turtle Creek Assocs.*, 736 F.2d 983 (4th Cir. 1984)................................10

*Bouman v. Block*, 940 F.2d 1211 (9th Cir. 1991) .....................................................7

*Bradley v. Pizzaco of Neb., Inc.*, 926 F.2d 714 (8th Cir. 1991)...............................7

*Brady v. Livingood*, 360 F. Supp. 2d 94 (D.D.C. 2004) ...........................................5

*Brady v. Off. of the Sergeant at Arms*, 520 F.3d 490 (D.C. Cir. 2008) ..............4, 29

*Brisbon v. Tischner*, 639 F. Supp. 3d 164 (D.D.C. 2022) ......................................26

*Brown v. Sessoms*, 774 F.3d 1016 (D.C. Cir. 2014)...............................................22

*Brown v. Whole Foods Mkt. Grp., Inc.*, 789 F.3d 146 (D.C. Cir. 2015) ...................2

*Bunch v. Bullard*, 795 F.2d 384 (5th Cir. 1986) ................................................9, 12

*Chaidez v. Ford Motor Co.*, 937 F.3d 998 (7th Cir. 2019).......................................6

*Council 31, Am. Fed'n of State v. Ward*, 978 F.2d 373 (7th Cir. 1992).................11

*Davis v. District of Columbia*, 925 F.3d 1240 (D.C. Cir. 2019) ........................9, 14

*Downing v. Abbott Lab'ys*, 48 F.4th 793 (7th Cir. 2022) .........................................8

*EEOC v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018 (11th Cir. 2016) ............... 18-19

*EEOC v. Catastrophe Mgmt. Sols.*, 876 F.3d 1273 (11th Cir. 2017) .....................19

*EEOC v. S.S. Clerks Union, Local 1066*, 48 F.3d 594 (1st Cir. 1995).............10, 14

*Erickson v. Pardus*, 551 U.S. 89 (2007) ..................................................................5

*Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038 (10th Cir. 2020) ....6

*Freeman v. Package Mach. Co.*, 865 F.2d 1331 (1st Cir. 1988).............................7

*Freyd v. Univ. of Or.*, 990 F.3d 1211 (9th Cir. 2021)....................................7, 9, 19

*Fudge v. City of Providence Fire Dep't*, 766 F.2d 650 (1st Cir. 1985)....................7

*Gordon v. U.S. Capitol Police*, 778 F.3d 158 (D.C. Cir. 2015) ................... 4, 28-29

*Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dept. of HUD*,
   639 F.3d 1078 (D.C. Cir. 2011)..............................................................5

*Hornick v. Borough of Duryea*, 507 F. Supp. 1091 (M.D. Pa. 1980).......................8

*Jianqing Wu v. Special Counsel*,
   No. 14-7159, 2015 U.S. App. LEXIS 22477 (D.C. Cir. Dec. 22, 2015)..............5

*Jones v. City of Boston*, 752 F.3d 38 (1st Cir. 2014)...........................................6, 11

*Marsh v. Eaton Corp.*, 639 F.2d 328 (6th Cir. 1981) ..............................................12

*Morgan v. Harris Trust & Sav. Bank of Chi.*, 867 F.2d 1023 (7th Cir. 1989) .........8

*NAACP v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464 (3d Cir. 2011)..............19

*Nanko Shipping, USA v. Alcoa, Inc.*, 850 F.3d 461 (D.C. Cir. 2017) ........... 5, 22-23

*Navab-Safavi v. Glassman*, 637 F.3d 311 (D.C. Cir. 2011) ....................................28

*N.Y.C. Transit Auth. v. Beazer*, 440 U.S. 568 (1979)..............................................20

*Ofisi v. BNP Paribas, S.A.*, 77 F.4th 667 (D.C. Cir. 2023) ................................2, 16

*Ortega v. Safeway Stores, Inc.*, 943 F.2d 1230 (10th Cir. 1991).............................7

*Phillips v. Cohen*, 400 F.3d 388 (6th Cir. 2005)......................................................12

*Ponce v. Billington*, 679 F.3d 840 (D.C. Cir. 2012)................................................29

*Ricci v. DeStefano*, 557 U.S. 557 (2009)..................................................................12

*Robinson v. City of Dallas*, 514 F.2d 1271 (5th Cir. 1975)......................................8

*Sw. Fair Hous. Council, Inc. v. Maricopa Domestic Water Improvement Dist.*,
   17 F.4th 950 (9th Cir. 2021) ................................................................10

*Thomas v. Metroflight, Inc.*, 814 F.2d 1506 (10th Cir. 1987) ................................19

*Vela v. Chertoff*, No. L-05-cv-217, 2008 U.S. Dist. LEXIS 20536
   (S.D. Tex. Mar. 17, 2008)......................................................................8

*Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989).......................................13

*Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977 (1988).........................................10

*Wislocki-Goin v. Mears*, 831 F.2d 1374 (7th Cir. 1987) .........................................20

*Wright v. Nat'l Archives & Recs. Serv.*, 609 F.2d 702 (11th Cir. 1979) ..................8

*W. Org. of Res. Councils v. Zinke*, 892 F.3d 1234 (D.C. Cir. 2018) ........................2

**Statutes and Regulations**

42 U.S.C. § 2000e(b) .................................................................................................12

42 U.S.C. § 2000e-2(k)(1)(A)(i) ..............................................................................21

42 U.S.C. § 2000e-2(m) ............................................................................................22

41 C.F.R. § 60-3.4 ...............................................................................................10, 11

**Other Authorities**

Civ. Rts. Div., U.S. Dep't of Just., Title VI Legal Manual § VII(C)(1)(d) (2024),

    https://www.justice.gov/crt/fcs/T6Manual7#N ..................................................13

## GLOSSARY

| | |
|---|---|
| BAC | International Union of Bricklayers and Allied Craftworkers |
| EEOC | Equal Employment Opportunity Commission |
| Title VII | Title VII of the Civil Rights Act of 1964 |

## INTRODUCTION AND SUMMARY OF ARGUMENT

The question on appeal is whether an employer's choice to implement a policy that gave most black employees less time and resources to comply and adversely affected a far higher proportion of black employees raises a plausible inference of disparate impact or disparate treatment. But BAC's brief reads as though the only issue in this case is whether a company-wide vaccine requirement is racially discriminatory. Such oversimplification is possible only because BAC ignores the allegations as pled. Considering the entirety of the record and drawing plausible inferences in favor of Appellants, as required at the motion to dismiss stage, this case should be allowed to proceed.

Beyond dismissing the historic mistreatment that has resulted in well-documented vaccine hesitancy among the black population as a "stereotype," BAC does not engage with the detailed allegations of racial bias at BAC, including unexplained salary disparities and extra scrutiny of black employees. BAC also does not meaningfully engage with allegations regarding how its own actions contributed to the disparate impact of its vaccine policy, downplaying how only traveling employees (mostly white) were invited to the vaccine hesitancy webinar, which it undisputedly chose not to share with the remaining (mostly black) employees (even though it sent a recording to its members). BAC also does not address that its General Counsel continually postponed a meeting requested by the (mostly black) bargaining

unit to consider extending the vaccine exemption deadline until after the deadline and then refused an extension on the grounds that the deadline had passed.

BAC is able to rewrite the facts to suit its argument because BAC ignores the motion to dismiss plausibility standard and attempts to try the case too early.[1] But at the motion to dismiss stage, Appellants only need to allege facts, read "in the light most favorable" to them, *Ofisi v. BNP Paribas, S.A.*, 77 F.4th 667, 670 (D.C. Cir. 2023) (citation omitted), to support a plausible inference of discrimination, *W. Org. of Res. Councils v. Zinke*, 892 F.3d 1234, 1240 (D.C. Cir. 2018). While BAC strains against (or ignores) record allegations that the district court correctly considered, it simultaneously attempts to inject new counter-allegations about vaccine hesitancy, infection rates, and other circumstances that it is free to introduce later, if it can prove them, but not now.

BAC will have its chance to put its own version of the facts and rationale for

---

[1] The district court, acting well within its discretion, plainly treated Appellants' oppositions to the motions to dismiss as part of the operative complaints. JA126; JA229; *Brown v. Whole Foods Mkt. Grp., Inc.*, 789 F.3d 146, 152 (D.C. Cir. 2015). BAC did not challenge the district court's decision to do so; neither did it cross-appeal. Moreover, BAC's proposed novel remedy for a non-existent problem, Br. 19-20, is inefficient and makes no sense. Under BAC's reading, allegations from the oppositions can be considered *only* for the purpose of deciding whether dismissal should be with prejudice or whether Appellants should be granted leave to amend. The upshot of BAC's stance is that a victory for Appellants would result in nothing more than a reissue of the district court orders without prejudice and a grant of leave to amend Appellants' complaints, which they would presumably do in line with the allegations contained in their oppositions—the very allegations already considered by the district court and this Court.

its decisions before a factfinder, but it is far too early for such a gambit. A legitimate business reason for a policy that discriminates by race may defeat a Title VII claim, but this analysis is left to summary judgment, as it often requires further factual development. Regardless, BAC does not address allegations that mandatory mask and social distancing rules were not enforced, that BAC had still not returned to the office full time two years after mandating vaccines, and that no boosters or vaccines for visitors or other tenants were ever required. Appointed Amicus Br. 19.

More fundamentally, BAC never engages with Appellants' central point: BAC did not simply adopt a universal vaccine policy. Initially, BAC required vaccination for only traveling employees, a subset of employees who were almost all white. BAC later abruptly changed course and expanded its mandatory vaccine policy to all employees, but without extending compliance deadlines. The timing meant that most of BAC's black employees (all but 4) had only 4 days to receive their first shot of the vaccine, while most white employees were given 76 days (and better information) for the same procedure.

BAC insists that this case is all about choices, and so long as there is *any* choice whether to comply with a policy, there can be no disparate impact. BAC's argument would inject new elements into disparate impact claims, found nowhere in statute. But BAC also ignores that when *it* chose to expand the scope of the vaccine requirement without extending the deadline, it created a four-day time limit for most

black employees that made their "choice" orders of magnitude harder than for the mostly white employees who had months to do their research, find a trusted medical professional, and consider whether to seek an exemption. BAC made the "choice" for most black employees harder still, because they were not provided with the same resources to overcome hesitancy. But black employees were the group that, per the allegations, most needed both more time and more resources, due to underlying vaccine hesitancy. Therefore, the result which EEOC warned employers about, JA175, came to pass: 13.5% of BAC's black employees but only 2% of BAC's white employees were suspended without pay, and 8% of black employees were fired. No white employee was fired. Appellants have raised at least a plausible inference that the vaccine policy discriminated on the basis of race, intentionally or via its impact.

## ARGUMENT

## I.    APPELLANTS HAVE SUFFICIENTLY PLED THAT BAC'S COVID-19 VACCINE POLICY HAD A DISPARATE IMPACT

While *proving* a case of disparate impact involves establishing a *prima facie* case and rebutting a defendant's "business justification" or providing a less discriminatory alternative, a *complaint* need not do any of these things. "At the motion to dismiss stage, the district court cannot throw out a complaint even if the plaintiff did not plead the elements of a prima facie case." *Brady v. Off. of the Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008); *see also Gordon v. U.S. Capitol Police*, 778 F.3d 158, 161-62 (D.C. Cir. 2015); EEOC Br. 16-17. Instead, to

survive a motion to dismiss, a disparate impact plaintiff must simply point to "statistical evidence that [a] practice or policy has an adverse effect on the protected group." *Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dept. of HUD*, 639 F.3d 1078, 1085-86 (D.C. Cir. 2011) (citation omitted). Ignoring both the "not onerous" pleading standard on a motion to dismiss, *Nanko Shipping, USA v. Alcoa, Inc.*, 850 F.3d 461, 467 (D.C. Cir. 2017) (quoting *Patterson v. McLean Credit Union*, 491 U.S. 164, 186 (1989)), and the fact that a *pro se* complaint is held to even "less stringent standards," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (citation omitted), BAC's argument hinges on reading novel and extratextual requirements into disparate impact law.

### A. Appellants Have Sufficiently Pled A Statistical Disparity

To survive a motion to dismiss, a plaintiff need only plead some "basic" statistics, *Adams v. City of Indianapolis*, 742 F.3d 720, 733 (7th Cir. 2014), or even just "a hint that [they] ha[d] or [could] obtain statistical evidence" of disparity in the future. *Jianqing Wu v. Special Counsel*, No. 14-7159, 2015 U.S. App. LEXIS 22477, at *3-5 (D.C. Cir. Dec. 22, 2015); *see also, e.g.*, *Brady v. Livingood*, 360 F. Supp. 2d 94, 100 (D.D.C. 2004) ("*some* statistical disparity, however elementary" suffices at motion to dismiss stage (emphasis in original)). The Seventh Circuit thus allowed a complaint to move forward when it contained only "basic allegations" that the racial makeup of the employer's workforce was "not consistent with the racial

demographics of the area" and supported this assertion by simply including photographs of classes of new hires. *Chaidez v. Ford Motor Co.*, 937 F.3d 998, 1006-07 (7th Cir. 2019) (citation omitted).

Here, Appellants have alleged that 13.5% of black employees were adversely affected, while only 2% of white employees were, and that five times as many black employees as white employees were adversely affected even though there are more white employees at BAC. This is plainly sufficient, and then some. *See* Appointed Amicus Br. 30-33; EEOC Br. at 19-21. To argue otherwise, BAC misinterprets the case law on statistical evidence, applies a summary judgment or trial standard, and effectively re-writes Title VII's statutory small-employer safe harbor.

**1.** The purpose of statistics in disparate impact analysis is to determine whether there was, in fact, a disproportionate impact of a policy on a protected group, and to understand whether that effect was truly correlated with race or instead due to randomness or chance. *See generally Jones v. City of Boston*, 752 F.3d 38, 50-53 (1st Cir. 2014). To make that assessment, courts examine "statistical significance," which can be assessed by a variety of mathematical tests. *See, e.g.*, *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1051-55 (10th Cir. 2020).

But without engaging in any of this analysis, BAC argues that the statistics Appellants present are categorically unable to demonstrate a disproportionate impact because a relatively small number of employees were adversely affected. This Court

6

should join other circuits in confirming that there is no such categorical rule, and that no "minimum number" is "necessary before a statistical disparity will be adequate." *Ortega v. Safeway Stores, Inc.*, 943 F.2d 1230, 1243 n.27 (10th Cir. 1991); *see also, e.g.*, *Bradley v. Pizzaco of Neb., Inc.*, 926 F.2d 714, 716 (8th Cir. 1991) ("there is no minimum sample size prescribed either in federal law or in statistical theory" (citation omitted)); *Freeman v. Package Mach. Co.*, 865 F.2d 1331, 1342 n.5 (1st Cir. 1988) ("even small samples are not *per se* unacceptable").

This is especially so at the motion to dismiss stage, because expert testimony is often required to unpack and interpret the raw data. As the First Circuit explained, "in cases involving a narrow data base," the court should analyze "statistical tests," presented to the court via "expert opinion," which can help a court "determine the competency and validity" of statistics "in a far more reliable manner than wholly intuitive response." *Fudge v. City of Providence Fire Dep't*, 766 F.2d 650, 658 (1st Cir. 1985); *see also Barnes v. Gencorp, Inc.,* 896 F.2d 1457, 1467 (6th Cir. 1990) (rejecting defendants' assertions that "the sample size is too small for the statistics to provide reliable results" in part because of plaintiffs' expert evidence). While the sample size may affect "the probative value of [plaintiff's] evidence … that is a matter for the experts to debate and the jury to resolve." *Freyd v. Univ. of Or.,* 990 F.3d 1211, 1226 (9th Cir. 2021); *see also Bouman v. Block*, 940 F.2d 1211, 1225 (9th Cir. 1991).

**2.** All of the cases BAC cites (Br. 39) for the proposition that Appellants' sample size is too small are inapposite for this reason: they all turned on the plaintiff's failure to *prove* a *prima facie* case at summary judgment or trial, a burden Appellants do not yet need to meet. *Downing v. Abbott Lab'ys*, 48 F.4th 793, 815-16 (7th Cir. 2022) (summary judgment after both parties had offered evidence regarding the hiring process); *Wright v. Nat'l Archives & Rec. Serv.*, 609 F.2d 702 (11th Cir. 1979) (bench trial); *Robinson v. City of Dallas*, 514 F.2d 1271 (5th Cir. 1975) (bench trial and plaintiff did not provide evidence of the rate of noncompliance for black employees compared to white employees); *Vela v. Chertoff*, No. L-05-cv-217, 2008 U.S. Dist. LEXIS 20536, at *15 (S.D. Tex. Mar. 17, 2008) (motion for summary judgment); *Hornick v. Borough of Duryea*, 507 F. Supp. 1091, 1103-04 (M.D. Pa. 1980) (motion for summary judgment).

Further, all of BAC's cited cases involve far smaller numbers than the ones at issue here. BAC relies on *Downing*, claiming that that court affirmed judgment for the employer on the disparate impact claim "based on an affected group of ten job applicants." Br. 39. Not quite; the "affected group" was *two* African Americans, out of ten total applicants, 48 F.4th at 815, compared to 89 total employees here. In *Wright*, the policy applied to only four people total.[2] 609 F.2d at 712.

---

[2] BAC also cites (Br. 40) *Morgan v. Harris Trust & Sav. Bank of Chi.*, 867 F.2d 1023 (7th Cir. 1989). Again, it's a summary judgment case—and its outcome did not hinge

What's more, plenty of courts have found *prima facie* cases of disparate impact established with small sample sizes at the summary judgment stage, reinforcing that cases cannot be dismissed on that basis alone. *See, e.g.*, *Freyd*, 990 F.3d at 1225-26 (finding *prima facie* case of disparate impact with total sample of 20); *Bunch v. Bullard*, 795 F.2d 384, 395 (5th Cir. 1986) (finding *prima facie* case of disparate impact with total sample of 28).

**3.** BAC relatedly argues that it is immaterial that the adverse-effect rate for black employees is 700% of the rate for white employees because the underlying numbers are too small, comparing the allegations here to a hypothetical where 2 of 100 black employees and 1 of 100 white employees were terminated (*i.e.*, where the termination rate for black employees is 200% of the rate for white employees). Br. 43. BAC asserts that in its hypothetical, the disparate impact would so obviously be *de minimis* as to require dismissal. BAC's argument against rate comparison has three problems. First, comparison of the rate of the adverse effects is frequently used to analyze disparities. *See, e.g.*, *Davis v. District of Columbia*, 925 F.3d 1240, 1251

---

on a too-small sample size. Rather than examining only the 25 employees cited by BAC as too small a number, the court found no disparate impact because it examined an 84-employee group and found the terminations "markedly balanced" compared to the racial proportions of the total tested employees. *Id.* at 1028. In addition, the court found the plaintiff failed to timely present expert testimony showing a "statistically significant impact," demonstrating yet again that disparate impact cases are not dismissed offhand for too-small numbers; instead, statistical significance is examined based on evidence at the summary judgment or trial stages. *Id.*

(D.C. Cir. 2019); *Betsey v. Turtle Creek Assocs.*, 736 F.2d 983, 988 (4th Cir. 1984). Second, the statistics that underlie the 700% calculation here are far afield of BAC's hypothetical of 98/100 and 99/100: 13.5% of black employees (5/37) were adversely affected, while only 2% of white employees (1/52) were. JA71. In BAC's hypothetical, the policy affected only 1% and 2% of employees, a tiny effect; not so here. Regardless, assessment of the technical statistical significance of impact rates is not appropriate for a motion to dismiss.

Third, BAC ignores other ways to look at the disparate impact here. The adversely affected employees were 83% black and 17% white, even though the overall employees were only 30% black and 42% white. Comparing the racial breakdown of the affected population to the racial breakdown of the overall population can support disparate impact. *Sw. Fair Hous. Council, Inc. v. Maricopa Domestic Water Improvement Dist.*, 17 F.4th 950, 956, 963-64 (9th Cir. 2021) (holding that a statistical disparity existed when 55% of the total customer base was non-white, but 89% of the adversely affected customers were non-white); *EEOC v. S.S. Clerks Union, Local 1066*, 48 F.3d 594, 605-06 (1st Cir. 1995).

**4.** To bolster its argument, BAC relies (Br. 42) on the EEOC's "four-fifths" guidance in hiring cases. 41 C.F.R. § 60-3.4. But BAC makes several errors. This guideline "has not provided more than a rule of thumb for the courts" and "has been criticized on technical grounds." *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977,

995 n.33 (1988); *see also, e.g.*, *Jones*, 752 F.3d at 51-52 (explaining critiques). The rule itself explains that "[s]maller differences in selection rate may nevertheless constitute adverse impact," including "where they are significant in both statistical and practical terms." 41 C.F.R. § 60-3.4. And even as a guideline, it is limited to selection rates for an employment position, not termination or compliance with a mandatory policy. *Id.*

Nonetheless attempting to leverage hiring guidance for a termination case, BAC alleges that the proper lens is the retention rate (86.5% and 98%) rather than the termination rate (13.5% and 2%).[3] Br. 43. But "[m]athematically speaking, retention rate analysis and layoff rate analysis are identical, like describing a glass half-full or half-empty. Preferring one approach over another makes little sense." *Council 31, Am. Fed'n of State v. Ward*, 978 F.2d 373, 379 n.3 (7th Cir. 1992). Deciding between these approaches is a fact-bound inquiry, *id.* at 379, to be developed by experts and decided by the jury, not a matter for a motion to dismiss.

---

[3] Moreover, BAC uses the wrong numbers. BAC claims that 90% of black employees were unaffected. Br. 42-43. This is incorrect. 32 out of 37 black employees were not adversely affected, a rate of 86%. Similarly, BAC claims that 7 employees were affected, 5 of whom were black. Br. 40-41. But the total number of affected employees is 6, not 7; so that the ratio of black employees affected to white employees affected is 5:1, not 5:2. BAC appears to have derived the total of 7 affected employees from Lambert's "gender" chart at JA214. But both Appellants consistently use a total of 6 affected employees in their briefing and in their racial charts. JA71; JA175. BAC is flouting the requirement to read all allegations in the light most favorable to Appellants.

**5.** Ultimately, by focusing solely on sample size as a bar to litigation, BAC would effectively prevent an employer with less than "thousands of employees," Br. 39, from ever being liable for disparate impact because there would rarely be sufficiently large numbers of employees affected by any policy. But Congress created a statutory safe harbor for employers with fewer than 15 employees. 42 U.S.C. § 2000e(b). BAC would effectively rewrite this safe harbor to apply to organizations, like itself, with employees numbering in the hundreds. *See Marsh v. Eaton Corp.*, 639 F.2d 328, 329 (6th Cir. 1981) (warning of using sample size limits in a way that would "preclude a smaller employer from being liable" for discrimination). But "an employer [cannot] escape liability for discriminatory tactics merely because his work force is not vast enough to provide meaningful data for a sophisticated statistical evaluation." *Bunch*, 795 F.2d at 395.

### B. Appellants Have Alleged Causation Under Any Standard

A policy causes disparate impact when the disparity is the result of the policy. "[A] prima facie case of disparate-impact liability [is] essentially, a threshold showing of a significant statistical disparity and nothing more." *Ricci v. DeStefano*, 557 U.S. 557, 587 (2009); *see also Phillips v. Cohen*, 400 F.3d 388, 397 n.8 (6th Cir. 2005) ("'causation' [is] established by showing that a specific practice—for example, a screening test, or a height or weight requirement—accounts for [a] group's under-representation."); Appointed Amicus Br. 34-36.

The causation requirement exists to avoid assigning disparate impact liability based on only an employer's "bottom line" racial demographics, without pointing to a specific policy (such as a diploma or residency requirement) that caused the disparate result. *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 656-57 (1989). But "there is no need for understanding *why* the policy results in the disparity." Civ. Rts. Div., U.S. Dep't of Just., Title VI Legal Manual § VII(C)(1)(d) (2024), https://www.justice.gov/crt/fcs/T6Manual7#N (emphasis added). As the Department of Justice explains, and BAC does not address or rebut, "the proper analysis is not about . . . why [racial] differences exist. Rather, the sole question at [the initial] phase of the case should be whether [a] policy in fact affects people of different races disproportionately." *Id.*

In its efforts to undermine this well-established law, BAC invents a brand-new "race-related barrier" requirement for disparate impact claims, misapplies its own made-up test to the allegations here, and creates a further new "hard choice" requirement.

### 1. **BAC invents a brand-new requirement for disparate impact: a "race-related barrier."**

BAC claims that Appellants have not shown causation because they have not pled a "race-related barrier" to vaccination. Br. 45-47. This is a requirement found nowhere in the statutory text or in case law. Disparate impact doctrine supports liability "based on evidence that the challenged practices have a disproportionately

adverse effect on the plaintiffs that cannot be justified as necessary to an employer's business." *Davis*, 925 F.3d at 1248-49. All that matters is that the practices have a disproportionate effect on a group of employees, not that the disparate effect be caused by some inherently race-related reason. For instance, in *Davis*, this Court held that a workforce reduction that targeted "demographically disproportionate departments" was "the kind of practice the disparate impact theory of discrimination exists to scrutinize." *Id.* at 1250-51. But there is nothing about departmental assignments or job classifications that is inherently race-based, nor did the Court require the plaintiffs there to allege that there was some "race-related barrier" that caused them to work in the departments targeted for layoffs. Case after case echoes this framing; a plaintiff must simply "demonstrate a causal relationship between the identified practice and the disparate impact." *S.S. Clerks Union, Local 1066*, 48 F.3d at 601. Other than defining the group disparately impacted, race is not a part of causation analysis.

Moreover, the "race-related barrier" element invented by BAC is an ill-defined concept and extremely difficult to apply. BAC appears to posit that it must be a factor that relates in some way to race ("race-related") and is also unchangeable or near-insurmountable by the individual (a "barrier").[4] But without any statutory or

---

[4] The barrier component is the flip side of BAC's "choice" argument, addressed further in I.B.3, *infra*.

regulatory source for this requirement, BAC leaves much else unanswered. Does the factor need to be inherent (physical or genetic) in a racial group? Must it be caused by historical discrimination? For instance, imagine an employer policy forbidding anyone from bringing meat in their lunch. And at this particular employer, it just so happens that all the vegetarians are white and all the non-vegetarians are black. Is this a sufficient race-related barrier? Or would BAC's rule require a showing that, generally, black people are less likely to be vegetarians? Or a showing that the meat-eating correlation with race is related to some historical discrimination or context? If one black employee is vegetarian, does that mean the policy is by definition not a "barrier" to employment? There is no statutory warrant for courts to wade into the sociological morass of determining which parts of a person's culture, beliefs, or characteristics are "race-related."

> **2.     *Even if BAC's newfound "race-related barrier" requirement had a basis in the law, Appellants have pled two such barriers here.***

First, Appellants repeatedly alleged that vaccine hesitancy exists at higher rates in the African American population due to historic discrimination and involuntary medical experiments on black victims. JA13-14; JA16; JA170; JA180. This societal barrier is well-documented, acknowledged by the government, accepted by the district court, and pled by Appellants. JA13-14; JA16; JA170; JA180; JA240; *see also* EEOC Br. 24-25. This social context is part of what prompted the COVID-19 Community Corps to create the "vaccine hesitancy" webinar which BAC

offered to its (largely white) traveling employees, and to its union members, but nonetheless withheld from most of its black employees. Appointed Amicus Br. 10-12, 43; JA62; JA171. As pled, vaccine hesitancy is indeed a "barrier correlated with being Black." BAC Br. 47.

BAC downplays this historical discrimination and resulting fear as a "stereotype." Br. 51-52. BAC also attempts to introduce new facts to support its allegation that black people are *not* more likely to have vaccine hesitancy. Br. 52 n.14. But especially in considering a motion to dismiss, where the allegations must be "taken in the light most favorable to the plaintiff and with all reasonable inferences drawn in his favor," *Ofisi*, 77 F.4th at 670, BAC cannot attempt to undermine the record allegations by introducing new "facts" of its own. Accepting Appellants' pleadings as true, Appellants have satisfied any (unfounded) requirement to plead a race-related barrier, because vaccine hesitancy does "create a headwind for persons of a particular demographic group," Br. 45, especially when having to obtain a vaccine on a tight deadline. *See* EEOC Br. 24-26. In addition to mental and emotional difficulties with obtaining a vaccine, vaccine hesitancy also means that black Americans may to want to speak with a doctor or trusted health professional before obtaining a vaccine, something that was difficult under BAC's uneven time constraints. JA16, JA157.

Second, BAC's two-tiered vaccine rollout, which resulted in most black

employees having less time and information to make a decision, exacerbated this hesitancy and erected another race-related barrier. *See* EEOC Br. 23-25. BAC dismisses the two-tiered vaccination policy as unsupported by the complaint, Br. 44, but BAC does not dispute that traveling employees were told in June that a vaccine was mandatory for them (via an all-company policy), and non-traveling employees were not told the same until August.

BAC decided to reinforce the distinction between traveling and non-traveling employees by inviting only traveling employees to the vaccine hesitancy webinar. It tries to gloss over this decision by claiming that the webinar was only for "union leadership," Br. 28, but this cannot explain away the allegation that BAC made a neat traveler/non-traveler employee invitee distinction, nor why a non-traveling black human resources manager at BAC was not invited or even made aware of the webinar. JA49.

BAC also tries to discount the allegations that planned October 2 travel set an effective 76-day deadline for traveling employees. BAC claims that the allegations do not specify that no travel occurred before the October 2 "meeting," or that this meeting required travel. Br. 26-27. This is wrong. Shanks and Lambert both alleged that the October 2 meeting involved the "first" work "travel" in the pandemic. JA71; JA214. BAC also argues that there is no allegation that all travel-eligible employees planned to travel on this date. Br. 27. But even if they did not all travel, the mostly

white traveling employees still had more time than the mostly black non-traveling group to make progress towards making a vaccination decision (76 days versus 4 days) or to begin assembling materials for an exemption request (99 days versus 25 days). As a point of comparison, the federal government gave employees 75 days to submit an accommodation request. JA180.[5] The limited time BAC provided to most black employees to seek an exemption was especially challenging given the scarcity of medical appointments during the pandemic. JA13; JA16.

### 3.    *BAC creates a new and unworkable requirement that disparate impact cannot involve an "easy choice."*

BAC claims that Appellants have not pled causation here because it was not the vaccination policy that caused their terminations, but rather their decisions not to comply with the policy. This is an incorrect reading of the law, which holds that "the presence of choice" does not "make discriminatory impact unprovable." *Thomas v. Metroflight, Inc.*, 814 F.2d 1506, 1511 (10th Cir. 1987). The vast majority of courts agree. *See* EEOC Br. 28. In fact, the only case that BAC cites to support its new requirement, Br. 49, is not even a disparate impact case. *EEOC v. Catastrophe*

---

[5] Even though BAC relies on "similar vaccination policies" adopted by local and federal governments to defend its actions, Br. 53, BAC ignores that the District of Columbia government allowed 45 days to get the first vaccine dose (versus 4 days here) and the federal government allowed 75 days to submit exemption requests (versus 25 days here). JA16; JA180. The District of Columbia government also allowed for a testing exception to vaccination, as the Appellants requested and BAC refused to provide. JA14; JA180.

*Mgmt. Sols.,* 852 F.3d 1018, 1024 (11th Cir. 2016) ("because this is … only a disparate treatment case, we do not address further the EEOC's arguments that [the] race-neutral grooming policy had … a disproportionate effect"). Some members of that court later suggested that a choice to wear dreadlocks *could* form the basis of a disparate impact claim. *EEOC v. Catastrophe Mgmt. Sols.,* 876 F.3d 1273, 1277 (11th Cir. 2017) (en banc) (Jordan, J., concurring in denial of rehearing) ("although the complaint alleged that black individuals wear dreadlocks more often than persons of other racial groups, that assertion makes more sense in the context of a disparate-impact claim").

Many other cases allow disparate impact claims where employee choices interact with an employer's policy. In a disparate impact case involving "retention raises" offered to professors who obtained an offer of employment at other institutions, the Ninth Circuit held that female professors were "less willing to move" and therefore to seek competing offers. *Freyd*, 990 F.3d at 1224 (9th Cir. 2021). Even though the dissenting judge argued that the disparate effect on female professors was partially dependent on their own choices, *id.* at 1239 (Vandyke, J., dissenting), the court reversed the district court's grant of summary judgment to the university on disparate impact, *id.* at 1228. Similarly, in *NAACP v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464 (3d Cir. 2011), the Third Circuit held that black employees who disproportionately lived outside the area covered by an employer's

residency requirement could state a disparate impact claim despite choosing not to move. *Id.* at 479-81.

And as explained in Appointed Amicus Br. at 44, the Supreme Court assumed that an employment policy related to methadone use could cause disparate impact, even though methadone is also a medical 'choice.' *See N.Y.C. Transit Auth. v. Beazer*, 440 U.S. 568, 585-87 (1979) (denying the claim for other reasons). The Seventh Circuit has similarly assumed that "dress and grooming standards" could form the basis of a disparate impact claim. *Wislocki-Goin v. Mears*, 831 F.2d 1374, 1380 (7th Cir. 1987).

BAC tries to distinguish these cases by drawing a line between hard choices and choices "easily" made. Br. 51. But BAC does not explain why getting a vaccine is an easy choice, but something else, like discontinuing use of methadone or obtaining a GED certification, is a sufficiently hard choice to constitute a race-related barrier. Maybe BAC considers getting a vaccine "easy" because it so readily dismisses African-American vaccine hesitancy without acknowledging its power as a mental and societal barrier. And it cannot be that timing alone renders a choice easy, because while some choices are difficult to change because they occurred in the past (such as being an undocumented immigrant), plenty of courts have found a disparate impact even when the plaintiff still could make a present or future choice to satisfy the relevant requirement (i.e. obtain a GED or comply with a dress code).

BAC also does not explain where these distinctions come from. The statutory text creates liability for an employer who "causes … on the basis of race" a disparate impact. 42 U.S.C. § 2000e-2(k)(1)(A)(i). The fine lines BAC wants to draw between conditions that result from past choices and future choices, between 'easy' and 'hard' choices, and between "race-related" barriers and barriers that have a disparate effect on some racial groups, require an awful lot of gloss on the statutory text. Drawing these difficult lines is a policy choice for Congress. Congress can choose to narrow the contours of disparate impact to rule out employer policies that create a disparate impact only because of characteristics that employees have an opportunity to change at various levels of effort. It has not done so.

At bottom, BAC ignores that the "choice" Appellants made here was not made in a vacuum. Instead, most of BAC's black employees were provided less information about the vaccine, given less opportunity to seek accommodation, and had only four days to decide whether to obtain a shot and seek out advice or guidance.[6] *See* EEOC Br. 29.

*       *       *

---

[6] This time constraint is why Appellants' allegations about the difficulty of obtaining medical appointments are relevant. JA16; JA157. They do not argue that it was difficult to obtain a *vaccination* appointment, as BAC claims, Br. 45, but that obtaining a *doctor's* appointment, either to discuss their concerns about the vaccine or to get the paperwork required to request a medical exemption, was impossible in the short time allotted.

Appellants pled a straightforward claim of disparate impact: a specific policy resulted in an adverse effect on black employees at a rate seven times higher than the rate for white employees. They have more than cleared the low bar of stating a plausible claim. Despite BAC's attempt to create new tests out of whole cloth, Appellants' straightforward allegations satisfy the long-standing disparate impact pleading requirements.

## II. APPELLANTS HAVE SUFFICIENTLY ALLEGED A PLAUSIBLE CLAIM OF DISPARATE TREATMENT

To state a claim of disparate treatment based on race, a complaint need only allege sufficient facts to "give[] rise to an inference" of discrimination. *Brown v. Sessoms*, 774 F.3d 1016, 1022 (D.C. Cir. 2014) (citation omitted). Such an inference exists if race "was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m). On a motion to dismiss, this showing is a low bar. Once again, BAC attempts to convert its motions to dismiss to motions for summary judgment and discounts the law of this Circuit establishing minimal pleading requirements. In *Nanko Shipping*, the black-owned corporate plaintiff alleged simply that the defendant had done business with a white-owned company yet imposed "unreasonable requirements" upon, and refused to do business with, the plaintiff. *Nanko Shipping, USA v. Alcoa, Inc.*, 850 F.3d 461, 469 (D.C. Cir. 2017) (Brown, J., dissenting). Because the plaintiff had alleged that the defendant had "treated [plaintiff] less favorably than similarly situated white-owned

22

companies," this Court held that the plaintiff had sufficiently alleged "intentional discrimination" because the pleading burden was not "onerous" and did not require "[a]llegations regarding … racial comments[] and pretext." *Id.* at 467 (citations omitted). Similarly, in *2922 Sherman Ave. Tenants' Ass'n v. District of Columbia*, 444 F.3d 673 (D.C. Cir. 2006), this Court held that "the fact that the tenants' buildings are located in disproportionately Hispanic neighborhoods could certainly motivate someone bent on discriminating against Hispanics to close the buildings. Their location alone could therefore give rise to an inference of discriminatory intent." *Id.* at 684. Under the standards of *Nanko* and *Sherman*, unaddressed by BAC, Appellants' allegations that BAC unevenly implemented the vaccine policy, in the context of alleged past discrimination, are sufficient at the motion to dismiss stage to raise an inference that BAC, at least in part, acted with discriminatory intent.

BAC dismisses or mischaracterizes the allegations here. First, Appellants alleged that BAC was attuned to the potential effect, by race, of the August decision to expand the vaccine mandate and chose to make that effect worse, not better. BAC tries to elide the traveling/non-traveling employee distinction by pointing out that both the June and August policies "applied to *all* employees of all races" and were announced to all employees at the same time. Br. 26. While the broad-brush "policies" applied universally, BAC does not dispute that *only* traveling employees were required to obtain a vaccine under the June policy—thus giving them a head start on

23

compliance. BAC also tries to hide the fact that most black employees were not invited to the vaccine hesitancy webinar by arguing that it was "primarily for the local union leaders and contractors," not employees. Br. 28. But this argument does not explain why the mostly-white traveling *employees* of BAC were invited but the mostly-black non-traveling employees were not. And even though BAC could have easily sent this webinar to its non-traveling employees after the fact, as it chose to do for its members, it did not do so. JA171-73.

Second, Appellants alleged that BAC decision-makers were prompted to expand the vaccine mandate to non-traveling employees in August with the expectation that black employees' terminations would result. Appellants point out that shortly after learning that Monetta Moseley, another outspoken advocate against racial discrimination at BAC, was unvaccinated, BAC suddenly switched course and expanded its vaccine mandate to all employees.[7] In attempting to rebut this point, BAC again battles a straw man. Appellants do not argue that a vaccine requirement was adopted *solely* to target Moseley, Br. 29-30; rather, the argument is that the *way*

---

[7] BAC claims that "Appointed Amicus's brief misrepresents the facts" by "suggesting that [O'Connor's] statement that she did not anticipate the vaccine requirement extending to non-traveling employees was close in time to the August 19 policy promulgation." Br. 30. This is incorrect. Appointed Amicus pointed to O'Connor's statement simply to show that the August policy was indeed a *change* from prior policy. Appointed Amicus Br. 50. The temporal proximity alleged is between BAC's adoption of the new policy and when O'Connor learned that Moseley was not vaccinated. Appointed Amicus Br. 50.

in which the vaccine policy was adopted (giving most black employees extremely short timelines and refusing to consider extensions or any equally safe alternatives) could plausibly support an inference of at least partly-discriminatory motivation.[8] Appointed Amicus Br. 59.

Relatedly, Appellants alleged that BAC did not follow standard termination practices, claiming that BAC's non-standard actions were more in line with a "good riddance" attitude. Appointed Amicus Br. 51. These allegations support an inference that the August 19 update was aimed at terminating black employees who were perceived as troublemakers because they kept highlighting racial disparities at BAC. *See* Appointed Amicus Br. 32. BAC dismisses this argument because it is based only on Appellants' "claims" about standard procedure, Br. 32-33, but under the motion to dismiss standard, a plaintiff's "claims," also known as allegations, are taken as true. BAC also insists that this carries no weight because Appellants did not point to a similarly situated white employee who was treated differently. Br. 33. But a plaintiff does not have to allege specific applications of a standard policy to allege a departure from procedure, as it is implicit in the definition of a "usual practice" or

---

[8] BAC also claims that Appointed Amicus made the "shocking (and baseless) accusation" that Dubberly was tracking black employees' vaccine compliance. Br. 31. But Shanks alleged that Dubberly called him and other Financial Management Unit (FMU) "staff" to track compliance, JA46, and there is at least a plausible inference that Shanks was referring to the black FMU accountants, JA40.

"standard procedure" that it is generally applied. Appointed Amicus Br. 51; *see also, e.g.*, *Brisbon v. Tischner*, 639 F. Supp. 3d 164, 175 (D.D.C. 2022).

Next, Appellants alleged that BAC has a history of racial discrimination. Appellants extensively catalogued this history, which includes ongoing salary and benefit disparities for black and non-black employees that Appellants have repeatedly brought to BAC's attention to no avail. JA39-40; JA43; JA68; JA181. Appellants have also pled that black employees have received harsher penalties than white employees for the same offenses and that black employees were denied promotion opportunities based on degree requirements that were not applied to white employees. JA42-43; JA166. BAC claims that because some of these events occurred or began more than 300 days before Appellants filed EEOC claims, they are irrelevant and should be "viewed as inherently suspect." Br. 33. There is no basis for BAC's categorical dismissal. Allegations of racially unequal treatment by an employer can provide context that can "support an inference" of "invidious motive." *Allen v. Johnson*, 795 F.3d 34, 40 (D.C. Cir. 2015); Appointed Amicus Br. 51-52. There is no strict time limit on when the treatment of minority employees can support a plausible inference of discrimination.

Finally, Appellants alleged that BAC's subsequent actions cast doubt on its stated reasons for the August vaccine mandate. BAC gives no reason to discount the allegation that even though the October 4 vaccination deadline was purportedly

adopted to coincide with return to full-time in-office work, BAC had *still* not fully returned to the office two years later and remained on a hybrid work schedule. JA46; JA51; JA189. BAC also provides no reason to disregard the allegations that it could have continued its existing policy of weekly testing for unvaccinated workers or extended remote work for employees who were given later notice of the vaccine requirement, and that it gave no explanation for rejecting these alternatives when the bargaining unit proposed them. Appointed Amicus Br. 53. Finally, BAC's failure to require vaccination for contractors or maintenance or janitorial staff, even though BAC was the landlord, casts doubt on BAC's stated explanations, and BAC makes no argument otherwise. JA48; JA179.

Instead, BAC quibbles with the details of the policies in the record regarding vaccination requirements for security contractors and for the building's other tenant (the AARP). Br. 34-35. BAC claims that the security contractor's policy required vaccination "if [security guards] entered office space where the client required vaccination for its employees." Br. 34. This requirement appears nowhere on the face of the policy, which simply noted that vaccination was becoming a requirement at more locations and that guards would be expected to be vaccinated if the client so required. JA198. Shanks and Lambert have alleged that BAC (the client) did *not*, in fact, require the security contractors in the building to be vaccinated, JA48; JA179; BAC will have its opportunity to prove otherwise at a later stage.

BAC also quibbles with the exact details of the AARP's vaccine policy and argues that it is irrelevant because the AARP did not share "office space" with BAC. Br. 34. But this is inapposite, because Appellants allege that AARP employees shared "common areas," not "office space," with BAC employees. JA48; JA179. BAC also claims that the AARP policy is immaterial because there are no allegations that BAC "had any right to demand vaccination from its tenants." Br. 34. But BAC implicitly held itself out as having this power, claiming in its October 5 Resolution that "BAC, in its capacity was both an employer and *as owner of its national headquarters facility*, has mandated vaccination for all office employees." JA208 (emphasis added). Any ambiguity in the allegations on these points should be considered in the light most favorable to Appellants. *Navab-Safavi v. Glassman*, 637 F.3d 311, 318 (D.C. Cir. 2011).

Ignoring the suspicious circumstances surrounding the adoption of the vaccine policy, BAC focuses on its pandemic context. But that too, is for a later stage. Only after the motion to dismiss stage do courts consider proposed non-discriminatory reasons for an employer's action and the plaintiff's attempts to "discredit the employer's explanation" as pretextual. *Aka v. Washington Hosp. Ctr.,* 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc); *see also Gordon*, 778 F.3d at 163-64 (explaining motion to dismiss standard). The alternative explanation that BAC tries to slip into the record, based on facts it introduces about relative rates of infection for various

COVID-19 strains, is not appropriately considered at this stage of the case without a chance for further factual development. *See, e.g.*, *Brady*, 520 F.3d at 493; *Gordon*, 778 F.3d at 161. Moreover, context about the ebbs and flows of the pandemic is irrelevant because Appellants do not contend that the vaccine requirement had no relation to COVID-19 concerns, as BAC claims, Br. 23, but that racial discrimination was one part of the motivation for the specific mechanics of BAC's racially uneven vaccine policy rollout. At the end of the day, questions of pretext and motivation are for summary judgment, because "[d]iscovery will often be necessary before the plaintiff can know whether both legitimate and illegitimate considerations played a part in the decision," *Ponce v. Billington*, 679 F.3d 840, 845 (D.C. Cir. 2012) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 247 n.12 (1989)).

Finally, like the district court, BAC wrongly relies on the purported racial neutrality of the policy, arguing that Appellants have not "pointed to any person of any other race that was treated differently under the policy" and therefore that "there is no allegation that the policy was applied in an intentionally racially-discriminatory manner." Br. 22. But a neutral policy that nonetheless targets one race can still be the basis for a disparate treatment claim; recall the hypothetical policy firing all third-floor workers when most Asian employees work on the third floor. *See* Appointed Amicus Br. 49, 55-58. What's more, Appellants *do* argue that the policy was applied in an intentionally racially discriminatory manner via the uneven rollout.

Appointed Amicus Br. 42-44, 56-57. It is not surprising that BAC ignores this, as it describes "whether employees were given enough information to educate them about safety, or whether employees were given sufficient time to consider their options" as "unofficial policy" and "minor disputes" not relevant to the racial impact of the policy. Br. 35, 44-45. But the allegation that BAC gave black employees insufficient time and information to make educated medical choices is the crux of the Appellants' disparate treatment argument.

BAC's decision to make it so much more difficult to comply with the vaccine requirement for a predominantly black group than for a predominantly white group reinforces the plausible inference that race was a reason that Appellants were terminated under the vaccine policy. BAC was warned by the federal government about the potential for vaccine policy to cause compliance difficulties for black employees. JA170; JA175. BAC not only did not attempt to ameliorate this burden but exacerbated it by providing an exceptionally short timeline to most of its black employees, refusing to extend the deadline for requesting an exemption, and declining to distribute the vaccine hesitancy webinar to most black employees. *See* Appointed Amicus Br. 49 (hypothetical about employee algebra test where employer provides study guides and more preparation time only to mostly-white group of employees). Rather than being irrelevant "minor disputes," the details of BAC's rollout plan, in combination with several other factors pled by Appellants, support a

plausible inference that the specifics of BAC's vaccine policy were at least partly motivated by discrimination.

## CONCLUSION

For the foregoing reasons, and those set forth in Appointed Amicus's opening brief, the district court's judgments should be reversed.

Respectfully submitted,

/s/Alexandra Mansbach
Alexandra Mansbach
Ruthanne M. Deutsch
Hyland Hunt
Deutsch Hunt PLLC
300 New Jersey Ave. NW
Suite 300
Washington, DC 20001
(202) 868-6915
Lmansbach@deutschhunt.com

*Appointed Amicus Curiae in Support of Appellants*

December 6, 2024

## CERTIFICATE OF COMPLIANCE

The foregoing brief is in 14-point Times New Roman proportional font and contains 7,716 words, and thus complies with the type-volume limitation set forth in this Court's order of August 9, 2024.

/s/Alexandra Mansbach
Alexandra Mansbach

December 6, 2024

# CERTIFICATE OF SERVICE

I certify that on December 6, 2024, I filed the foregoing using the Court's case management electronic case filing system, which will automatically serve notice of the filing on registered users of that system.

I certify that on December 6, 2024, with Appellants' written consent, this brief was served by email to:

Samuel Shanks
samuel.shanks@gmail.com


Taylor Lambert
Tc.lambert16@gmail.com

/s/Alexandra Mansbach
Alexandra Mansbach